UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FOREST RESOURCE COUNCIL,** 5100 SW Macadam Ave., Ste. 350, Portland, OR 97239; **CARPENTERS INDUSTRIAL COUNCIL,** 12788 SE Stark Street, Portland, OR 97233; **DOUGLAS TIMBER OPERATORS, INC.,** 3000 Stewart Parkway, Suite 208, Roseburg, OR 97470; **C & D LUMBER CO.,** 1182 Pruner Road, Riddle, OR 97469; **FRERES LUMBER CO. INC.,** P.O. Box 276, Lyons, OR 97358; **SENECA SAWMILL COMPANY** including its affiliate **SENECA JONES TIMBER COMPANY**, 90201 Highway 99N, Eugene, OR 97401; **STARFIRE LUMBER CO., INC.,** P.O. Box 547, Cottage Grove, OR 97424; **SWANSON GROUP MFG. LLC**, 2695 Glendale Valley Road, Glendale, OR 97442, <br><br> Plaintiffs, <br><br> v. <br><br> **NEIL KORNZE**, Director, Bureau of Land Management, 1849 C Street NW, Washington, D.C. 20240 and **S. M. R. JEWELL**, Secretary of Interior, 1849 C Street NW, Washington, D.C. 20240, <br><br> Defendants | Civil No. <br><br> Action for Declaratory and Injunctive Relief to Remedy Violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. §1181a; Federal Land Policy and Management Act, 43 U.S.C.A. §1701 Savings Provision; and Administrative Procedure Act, 5 U.S.C.§§701-706 |

## COMPLAINT

For their complaint herein, plaintiffs allege as follows:

### INTRODUCTION

1. This is an action against the Hon. Neil Kornze, Director of the Bureau of Land Management (BLM), and the Hon. S. M. R. Jewell, Secretary of Interior, for declaratory and injunctive relief to remedy violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 (O&C Act), 43 U.S.C. §1181a, the Federal Land Policy and

Page 1 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

Management Act (FLPMA), 43 U.S.C.A. §1701 Savings Provision, and the Administrative Procedure Act (APA), 5 U.S.C.§§701-706, relating to the decision by defendant Kornze (through Deputy BLM Director Steven A. Ellis) on August 5, 2016 approving the Southwest Oregon Resource Management Plan and the Northwestern and Coastal Oregon Resource Management Plan (2016 RMPs) to direct the management of six BLM districts in Western Oregon.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief) and § 2202 (injunctive relief).  Plaintiffs have challenged final agency action as defined by the APA, 5 U.S.C. §704.  Venue in this district is proper under 28 U.S.C. § 1391(e) because defendant Kornze and the Secretary of the Interior were personally involved in the issues raised in this case, the challenged decision was approved in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and the defendants reside in this district.  This action is timely under 28 U.S.C. § 2401(a)(1) because the 2016 RMPs were approved on August 5, 2016.

## PARTIES

3.      Plaintiff American Forest Resource Council (AFRC), a nonprofit corporation organized under the laws of the state of Oregon, is a forest products trade association located in Portland, Oregon which represents approximately 60 wood products manufacturing companies and landowners throughout the states of Washington, Oregon, California and elsewhere in the western United States. Among AFRC's members are plaintiffs C & D Lumber Co., Freres Lumber Co. Inc, Seneca Sawmill Company, Starfire Lumber Co., Inc., and Swanson Group Mfg. LLC, as well as companies such as Hampton Industries, with operations in Washington and Oregon; Interfor Pacific, Inc., with operations in Oregon, Washington and elsewhere; Rosboro, LLC, based in Oregon; Roseburg Forest Products, with operations in Oregon and California, and South Coast Lumber, Co, in Brookings, OR,

Page 2 - Complaint

all of which have recently purchased BLM timber sales and seek to purchase more such sales.  Many of AFRC's members could not continue to operate at their current levels of production, and would suffer financial harm, without a reliable and adequate supply of timber sold by the BLM.  One of AFRC's primary purposes is to represent the interests of its members on matters relating to federal timber supply.

4.    AFRC and its predecessors have served as the representative for the wood products industry on major regional federal land management decisions since 1986.  AFRC collects information about the environmental, economic and social impacts of these major federal land management decisions, and disseminates this information to its members and participants, to public officials and to thousands of members of the public who are directly affected by these decisions.

5.    AFRC also represents the interests of its members who own private forest land, including many who own private forest land intermingled with, adjoining or adjacent to O&C forests.  The ability of these companies to manage their own lands has been and will be directly and adversely affected by the BLM's management of the O&C lands.  The risk of fire, disease or insect infestation starting on O&C land and spreading to nearby private land has been greatly increased by the 2016 RMPs because those decisions hinder or proscribe land management activities, including implementation of hazardous fuel reduction projects, on 74 percent of the O&C lands.  These restrictions present a substantial threat to AFRC members' lands in the vicinity of these O&C forests, which the decisions challenged in this case substantially increased, and may also limit AFRC members' access to their lands through these O&C forests.

6.    Plaintiff Carpenters Industrial Council (CIC) is a labor organization that represents thousands of forest products workers in Oregon, Washington, northern California and nationwide.  The CIC was chartered July 1, 2006, by the United Brotherhood of Carpenters and Joiners of America, which is headquartered in Washington, D.C.  The CIC was formed after the merger of four

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

Regional Industrial Councils – the Carpenters East Coast Industrial Council, the Midwestern Council of Industrial Workers, the Southern Council of Industrial Workers, and the Western Council of Industrial Workers.  Many CIC members live in remote communities that are heavily dependent on BLM timber.  Several thousand of these workers have experienced, or continue to be threatened with, permanent job loss caused by timber supply reductions resulting from the land management plans adopted for the BLM's western Oregon districts since 1995, including the 2016 RMPs.  There are few, if any, prospects for CIC members to replace their jobs at a comparable wage in their home towns.

7.      Plaintiff Douglas Timber Operators, Inc. (DTO), a nonprofit corporation organized under the laws of the State of Oregon, is a forest products trade association located in Roseburg, Oregon which represents approximately 145 timber and logging companies and other businesses operating in Douglas, Coos and Lane Counties and elsewhere in Oregon.  DTO's membership includes businesses in every segment of the forest products industry, from logging companies and small independent sawmills to large integrated manufacturers.  DTO's members include such companies as C & D Lumber Co.; Herbert Lumber Co., based in Riddle, Oregon; Starfire Lumber Co. and Douglas County Forest Products, based in Winchester, Oregon.  DTO's members purchase many of the timber sales that are offered by the BLM's western Oregon districts.  These companies have historically depended in large measure on timber sold by the BLM for their timber supply.  One of DTO's primary purposes is to represent the interests of its members on matters relating to federal timber supply.

8.      Plaintiff C & D Lumber Co. (C & D) is a family-owned manufacturer of lumber and wood products located in Riddle, Oregon, where it has operated for more than 60 years.  C & D is a member of AFRC and DTO.  C & D operates a cutting mill that can process logs as small as six inches in diameter but operates most efficiently with larger, high quality Douglas-fir, incense cedar

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

and Port Orford cedar logs over sixteen inches in diameter. C&D employs about 110 workers at its mill and associated facilities, and produces about 40 million board feet of lumber annually. C & D has no trouble selling all of the forest products it produces. C & D purchases and has historically depended heavily on timber sold from the O&C lands in the BLM's Medford and Roseburg Districts and from the Umpqua and Willamette National Forests and on timber supplied by other private and state timberland owners for the raw materials needed to operate its processing facility. C & D is certified as a small business by the Small Business Administration (SBA).

9.     Riddle is a small town in Douglas County, in rural southwestern Oregon, with a population of about 1,000. C & D was founded in Douglas County, and has operated there for more than 60 years. When it is in full operation C & D can process up to 55 million board feet of timber per year, but is currently unable to process that volume of wood due to lack of log supply. C & D recently made a significant mill modernization update, and with adequate timber supply it expects to continue indefinitely to provide wood products to its customers for use in building construction throughout the United States. Without an adequate supply of timber, C & D faces the prospect of being forced to shut down, lay off all its employees and close its doors forever.

10. Silver Butte Timber Company, a sister company of C & D with common ownership, owns 45,000 acres of forest land in Douglas, Coos, Jackson and Josephine Counties, Oregon. The Silver Butte lands can supply C & D with only about 15-25 percent of its required raw material supply. Approximately 80-90 percent of Silver Butte's holdings are adjacent on at least two, and in some cases four, sides to BLM O&C Act timber lands, including O&C land that has been designated as no-management reserves in the 2016 RMPs. The management practices on the adjoining BLM lands directly and substantially influence the health and safety of Silver Butte's timberland assets, and substantially threaten C&D's timber supply.

11. The failure of the BLM to offer the level of sustained-yield timber sales required by

Page 5 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347  ●  E-mail: markrutzick@rutzick.com

the O&C Act directly and substantially harms and threatens to harm C & D. The absence of these sustained-yield timber sales denies C & D the opportunity to bid on a supply of timber that it would like to purchase at competitive auction in the upcoming months and years to meet the increasing demand for home construction materials in the United States. In addition, an increase in BLM timber sales would mean more effective and proactive management of BLM forestlands, reducing the risk of fire, disease or insect infestation starting on BLM land and spreading to Silver Butte's land. There is a substantial probability that Silver Butte's lands will be directly and substantially harmed by the failure to offer the timber sales mandated by the O&C Act. The risk of fire, disease or insect infestation starting on BLM land and spreading to adjoining C & D land has increased due to past BLM land mismanagement, will substantially increase further under the 2016 RMPs, and is substantial at the present time.

12.   Plaintiff Freres Lumber Co. Inc. (Freres) is a family-owned small business that was founded in 1922.  Freres operates mills that manufacture softwood veneer, lumber and plywood.  The company is headquartered in Lyons, Oregon, 20 miles east of Salem, Oregon.  Freres is a member of AFRC.  Freres purchases federal timber from the BLM's Salem District and the Mt. Hood, Willamette, and Siuslaw National Forests.  Freres is the largest contract holder of BLM timber in the state of Oregon.  The decision in the 2016 RMPs to reduce BLM timber sales far below the legally required level will severely hinder Freres' ability to maintain its current level of operations.

13. Freres currently employs about 480 people, but at its peak capacity, it can employ as many as 499 workers.  In the decade 1980-89, Freres processed approximately 50 million board feet of timber per year.  Since the 1980's the company has invested heavily in new technology that has increased its capability to process timber.  In the past decade alone Freres has invested over $65 million in new equipment and technology for its plants in order to modernize the mill and increase its capacity.  Over the past decade Freres has processed on average (with considerable variation)

Page 6 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

about 78 million board feet of timber per year, and it is currently capable of processing 100 million board feet of timber per year if adequate timber supply were available.  In 2011-13 Freres averaged 86 million board feet of timber processed in its mill and sold as finished wood products.  Freres would increase its production to its 100 million board foot capacity, and hire additional employees to perform the work, if additional timber were available.  Freres is a modern, efficient processor of timber, and with adequate timber supply it expects to continue indefinitely to provide wood products to its customers for use in building construction throughout the United States.  Freres has no difficulty selling all of the forests products it manufactures.

14.  In the decade 1980-89, almost 100 percent of Freres' timber supply came from federal forests and State of Oregon lands.  About 75 percent of its timber supply (37.5 million board feet) was provided by the Forest Service, 15 percent (7.5 million board feet) by the BLM and 10 percent (5 million board feet) from Oregon state lands.  Its current capacity is double the 1980's level, but since the 1980's the Forest Service and BLM timber sale programs have diminished to a small fraction of 1980s levels.  In the 1980's western Oregon national forests sold over three billion board feet of timber per year, and the BLM sold over one billion board feet of timber per year.  Today the Forest Service allowable sale level in western Oregon has been reduced to only about 350 million board feet of timber per year, and the 2016 RMPs set the BLM annual allowable sale level at only 17 percent of the legally required volume.  The drop in Forest Service timber has been greatest, as Freres now obtains just 14 percent of its timber supply (12 million board feet) from the Forest Service.  Freres' BLM percentage of timber has dropped to 12 percent (10 million board feet), and timber from Oregon state lands slightly increased to 12 percent (10 million board feet).  Its sister company Freres Timber owns 14,500 acres of timberland and another related entity, Freres Partnership LLC, owns 2,400 acres, but under the sustained-yield management that these companies practice, their lands (referred to jointly as Freres Lands) can supply only about 13 percent of Freres'

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

annual timber requirement, and Freres is not able to increase the annual supply of timber from the Freres Lands without destroying their long-term productivity.

15. In addition to BLM timber sales, Freres acquires timber for its mills from the Mt. Hood, Siuslaw and Willamette National Forests, Oregon state forests and private timberland owners. None of these sources has any prospect of supplying a steady and reliable increase in timber production that would allow Freres to expand its business. The National Forests operate under the Northwest Forest Plan adopted in 1994, which is not scheduled to be revised in western Oregon for at least five more years. Each national Forest has an annual allowable sale quantity of timber that it is not permitted to exceed. The Forest Service rarely if ever achieves its allowable sale quantity, and there is no plausible likelihood the Forest Service will voluntarily or involuntarily increase timber sales from the Mt. Hood, Siuslaw or Willamette National Forests in the next five years or longer. Oregon state forests also operate under a maximum permitted annual sale volume, and the State of Oregon has no plans to increase the permitted annual sale volume on its state forests in the foreseeable future. Oregon has offered sell one of its premier timber-producing state forests due to the low sale volume it has achieved in recent years.

16. Freres currently purchases about half its timber supply on the open market from other private companies, but for several reasons these sales do not have the same value to Freres as BLM sustained-yield sales. First, these sales are solely at the discretion of the seller, and Freres has no contractual right to any steady supply of timber from any private company. Any company could stop selling timber, or stop selling timber to Freres, at any time without notice. For these reasons, Freres does not rely on private timber purchases as a basis for expanding its production. In contrast, a BLM timber sale contract generally allows three years for completion of the sale, so Freres can plan its operations with the certainty that the BLM logs will be available at the time of its choosing during the sale period. In addition, the BLM has a legal obligation to sell its declared and determined

Page 8 - Complaint

allowable sale quantity each year, so Freres should be able to rely on a steady supply of BLM sustained-yield sales every year at the full productive capacity of the O&C lands.  While sales are all competitively bid, and Freres has no guarantee of being able to purchase any particular sale, there is a substantial probability that Freres would purchase additional BLM timber sales if they are offered.  Freres is certified as a small business under SBA rules, and a certain percentage of BLM timber sales are set aside for bidding solely by certified small businesses like Freres, increasing its chances of successfully bidding on those sales. Freres has been injured by BLM's failure to offer the full legally-required level of sustained-yield sales.  BLM's certain failure under the 2016 RMPs to offer the full required level of sustained-yield sales each year (calculated with no reserves) creates a substantial probability of imminent future injury to Freres through loss of the opportunity to bid on additional timber sales and to process 14 million board feet of timber into additional forest products to be sold this year and next year and the year after that, indefinitely.  The non-sustained-yield thinning sales offered by the BLM are not sufficiently reliable to serve as the basis for business expansion because there is no way to predict from year to year how many non-sustained-yield sales will be offered.

17. The BLM's continued failure to offer sustained-yield timber sales based on permanent forest production of all the suitable O&C timberlands in the BLM Salem district, and other districts, has also injured and imminently threatens to continue to injure Freres by making log prices higher than they otherwise would be (reducing the company's profit margin and total profit).  If the BLM Salem district, and other BLM districts in Oregon, increased their annual timber sale volume to the level required by the O&C Act, it is very likely that log prices in western Oregon would decline across the board, which would add to Freres' profit margin and total profit. There is a substantial probability that BLM's on-going violations of the O&C Act will cause Freres to suffer imminent future financial loss from having to pay above-market prices for the logs its purchases, which

Page 9 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

reduces the profit margin and profitability of the wood products it sells.

18. The quality of wood on BLM timber sales is very high, which increases the profitability of the forest products produced from those sales. In addition, the BLM is required to offer its full allowable sale quantity of sustained-yield sales every year regardless of log prices, and federal timber may not lawfully be exported, eliminating purchases by China as a market factor, which tempers bidding prices for BLM sales.

19. The Freres Lands share 36 miles of boundary with O&C lands subject to the 2016 RMPs, including many miles of O&C land that has been designated as no-management reserves in the 2016 RMPs, and the Freres Lands are directly, immediately and substantially threatened with fire starting on poorly managed BLM lands and spreading uncontrollably onto the Freres Lands.

20. Plaintiff Seneca Sawmill Company (Seneca) was founded by Aaron U. Jones in Eugene, Oregon in 1953 and continues to be owned by members of the Aaron U. Jones family. Seneca is a leading innovator in lumber manufacturing, and Seneca holds over 25 U.S. and Canadian patents in various sawmill technologies. Seneca manufactures 550 million board feet of studs and dimension lumber products annually from its manufacturing facilities in Eugene and Noti, Oregon, and sells everything it can produce. Seneca's affiliate Seneca Jones Timber Company (Seneca Jones) owns approximately 167,000 acres of forestland in Lane, Douglas, Curry, Jackson, Linn, Benton, Coos and Josephine Counties, Oregon. Seneca Jones manages its timberlands on a long-term sustained-yield basis. Operating on a sustained yield basis, Seneca Jones timberlands can only supply about 28% of Seneca Sawmill's required timber needs. Seneca Sawmill currently employs about 420 workers, and is an SBA-qualified small business. Seneca relies heavily on timber supplied by the Coos Bay, Eugene, Roseburg and Salem districts of the BLM and by nearby national forests, which complements the timber available annually from Seneca Jones. There is no prospect that the USFS can increase its timber sale volume, so BLM is the only seller capable of increasing its annual timber

Page 10 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax: 703-870-7347   ●   E-mail: markrutzick@rutzick.com

sale level.  Seneca is a member of AFRC.

21.  Seneca Sawmill cannot maintain its current production level without a steady or increasing supply of federal timber.  Seneca Sawmill does not currently operate at capacity, and an additional timber supply will be needed to produce at capacity.  The continuing lack of adequate timber sales under the 2016 RMPs will also increase the cost of logs, causing financial harm to Seneca Sawmill.  BLM sustained-yield sales are the only reliable source of additional timber that would allow increased production.  Neither the Forest Service, Oregon state lands, Seneca Jones, other private landowners nor BLM non-sustained-yield thinning sales can be relied on to supply more timber than their current sale level.  Seneca's inability to operate at full capacity has reduced and will continue to reduce the company's profitability.  Seneca has been injured by the denial of the opportunity to bid on the full supply of BLM sustained-yield sales that are legally required to be offered each year, and faces the imminent threat of such future harm.

22.  The Seneca Jones timberlands include forestland that is both adjacent to, and, many times, intermingled with BLM land.  Seneca Jones timberlands share a common boundary with O&C timberlands over a linear distance of 689 miles, including many linear miles of O&C land that has been designated as no-management reserves in the 2016 RMPs.

23.  Although the O&C Act requires BLM to manage all of its O&C timberlands for permanent forest production, for the past 20 years BLM has failed to do so over a majority of the O&C land it manages.  The 2016 RMPs further reduce the area of O&C land that BLM is permitted to manage for sustained-yield timber production to 20 percent of its forested land base, down from 27 percent under the 1995 RMPs, with 74 percent allocated to unlawful reserves where permanent forest production has been prohibited, and six percent to sparsely forested areas with no significant potential for timber production. The "Harvest Land Base" where sustained-yield timber production is permitted contains just 18 percent of the 72 billion board feet of standing timber on the O&C

Page 11 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

lands.  Proposed Resource Management Plan/Final EIS (2016) (FEIS) at 335.  The past unlawful management of the O&C lands has already resulted in neglect and mismanagement of adjoining O&C lands, creating hundreds of thousands of acres of forests with high fuel loads that increase the risk, spread and intensity of wildfire, and threaten Seneca Jones' forestland.  Conditions will only get worse under the 2016 RMPs.  Continued neglect and mismanagement of BLM lands is a direct, immediate and substantial threat to Seneca Sawmill's business and Seneca Jones' forest land.  Seneca Jones relies on access to its own land through rights-of-way across BLM land.  Loss of a BLM right-of-way road will cost Seneca Jones significant economic loss by preventing, or at least increasing the expense of, removal of Seneca Jones' timber from its own land, thereby reducing the profitability of any subsequent use of the timber and causing financial harm to Seneca Jones.

24. The risk of fire, disease or insect infestation starting on BLM lands and spreading to adjoining private land has increased substantially over the past 20 years, is substantial and will continue to increase as long as BLM fails to manage all of the O&C timberlands for permanent forest production under the O&C Act.  For Seneca Jones, this concern is not imaginary.  In 2009, the Williams Creek Fire in Douglas County burned approximately 490 acres of Seneca Jones property in late July and early August.  The fire started on Forest Service land over two miles from Seneca Jones property in an area where no active management had occurred for over 15 years, and there were no maintained roads suitable for mechanized access – the same management regime that is commanded by the 2016 RMPs for 74 percent of the O&C timberlands.

25. For the Williams Creek fire, lack of access to the burning area by mechanized transport created difficulty in firefighting efforts from the beginning of the fire throughout the life of the incident.  Over the 16-day incident, access by ground personnel was a severely limiting factor in providing opportunity for control of the fire.  Without access for facilitation of effective retreat for ground forces, safety concerns dictated an indirect attack method that utilized natural landscape

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

features for controlling the perimeter location.   Therefore, the Forest Service had to conduct a backburning of Seneca property on or near a ridgeline in three separate locations, with a total burned area of approximately 490 acres.  Backburning of Seneca property should not have been necessary because there is an intervening ridge of Forest Service land between the area where the fire started and Seneca's property, which could have been used as the site for the backburn had proper access been available.  Unfortunately, the fire crews could not gain access to this ridge due to the Forest Service's failure to properly manage its land.  The fire crews could gain easy access to Seneca Jones land, so they had no choice but to use Seneca's land for the backburn.

26. Seneca Jones' losses included Douglas-fir plantations ranging in age from four to 29 years, and many acres were 28 years old with a net value of $3,000 per acre.  Seneca has reestablished these plantations with an initial average cost of $600 per acre, and will incur further costs associated with fertilization and precommercial thinning. Had the Forest Service been actively managing the area adjacent to Seneca property, they would have been able to control the fire prior to its entering Seneca's land.  The management regime adopted in the 2016 RMPs will result in comparable management constraints on the O&C land adjoining Seneca Jones' property.

27. Plaintiff Starfire Lumber Co., Inc. (Starfire) is a family-owned small business that manufactures high grade Douglas-fir lumber, including beams, stringers, timbers, clears and other specialty cuttings, at its mill in Cottage Grove, Oregon.  Starfire is a member of AFRC and DTO. Starfire owns virtually no commercial forestland so timber from federal land has been and remains a vital source of its log supply.  Starfire obtains its logs from O&C lands including the Salem, Eugene, and Roseburg BLM Districts as well as the Mt. Hood, Willamette, Siuslaw and Umpqua National Forests.  The BLM forests formerly provided a steady supply of high quality large logs suitable for Starfire's operations, but BLM timber sales containing high quality logs have sharply declined even though the O&C lands contain a huge inventory of large high quality trees.

Page 13 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

28.   Starfire currently has 75 employees, and processes approximately 2.5 million board feet of timber per month, equal to 30 million board feet per year.  It currently operates one shift at the mill, but with additional reliable timber supply it would expand its operations by adding a second shift and hiring new employees to work that shift, which would make the company more efficient and more profitable.  However at the present time Starfire does not have any additional reliable source of timber supply that would permit it to add a second shift.  Starfire is certified as an SBA small business, and can sell all the forest products it produces without difficulty.

29.   In the 1980's and early 1990's, when federal timber supply was more plentiful, Starfire operated three shifts, employing 120 workers and consuming about 4.5 million board feet per month, equal to 54 million board feet per year.  At that time approximately 70-90 percent of its timber supply came from federal forestlands within its sourcing radius (the geographic distance at which Starfire can afford to ship logs to the mill). Of that portion of its timber supply, approximately 15 percent came from the BLM and approximately 85 percent from USFS.  However since the Northwest Forest Plan was adopted in 1994 reducing federal timber sales by more than 80 percent, the availability of BLM and Forest Service timber has dropped sharply.  Today only approximately 1 percent of Starfire's log supply comes from BLM.  About 1.5 percent comes from the Forest Service, and the rest of its log supply comes from private timberland owners.  Starfire has no long term contracts with any supplier. The company purchases logs one month at a time at a negotiated price based on current log market prices.

30.   Starfire processes large-diameter logs that commonly comprise only a small proportion of the typical BLM timber sale today.  Starfire regularly purchases BLM logs from other companies that purchase a BLM timber sale, operate the sale and then sell Starfire the large-diameter logs from the sale, which normally are too big to be processed in most small-dimension sawmills. In particular, BLM sustained-yield sales are most likely to contain large-diameter logs suitable for

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Starfire while the non-sustained-yield thinning sales have few if any large-diameter logs suitable for Starfire. All of the BLM logs Starfire currently owns came from other purchasers of BLM timber sales, although on occasion Starfire will bid on and buy a BLM timber sale. All of the O&C Lands are within its sourcing radius. Starfire has been injured, and faces imminent threat of future injury, by the failure of the 2016 RMPs to permit BLM to offer the full legally-required level of sustained-yield sales from the O&C lands.

31. There is no prospect the Forest Service will increase its annual harvest level in the near future, and there is no prospect that any private timberland owner will enter into a long-term supply contract with Starfire, or will increase the monthly volume of timber Starfire purchases at the present time. The only plausible source of increased timber supply in its area is the BLM. Starfire purchases BLM logs originating on the Salem, Eugene, and Roseburg BLM Districts. If these districts offered a higher volume of sustained-yield timber sales, it is very likely that the additional sustained-yield sales would contain additional large-diameter logs, and that Starfire would be able to purchase additional logs from such sales. In addition, if more BLM sustained-yield sales were offered on these districts, Starfire, as an SBA-certified small business, would likely be able to purchase a sale at competitive auction, which would be a source of profit for the company even if it sells the small-diameter logs to other enterprises.

32. Plaintiff Swanson Group Mfg. LLC (Swanson) is a family-owned enterprise that operates forest product manufacturing facilities in Glendale, Roseburg and Springfield, Oregon and employs over 700 workers at its sawmills and related operations. Swanson is one of the largest purchasers of timber sales offered by the BLM in Oregon. At the current time Swanson's manufacturing facilities process 200-300 million board feet of timber in a year (the variation is due to differing log scaling measures), producing wood products sold to customers throughout the United States. Swanson has no trouble selling all the wood products it currently produces. Swanson has the capacity

Page 15 - Complaint

to process an additional 58 million board feet of timber in a year by running additional shifts at its mills. If Swanson could produce more wood products the company would easily be able to sell those products into the open market and increase its profitability. Swanson is a member of the AFRC and DTO.

33. Swanson owns virtually no private timber land. For its supply of raw materials to operate its business, Swanson relies on BLM timber provided by the Medford, Roseburg, Coos Bay, Eugene and Salem districts, on USFS timber from the Rogue-Siskiyou, Umpqua, Willamette and Siuslaw National Forests, on timber supplied by the State of Oregon and on timber supplied by private timberland owners. Swanson is currently unable to purchase additional timber for processing beyond the volume it now processes.

34. The Forest Service is not capable of selling more timber than it currently does. Each national forest has an allowable annual sale quantity of timber set in its land and resource management plan, and it cannot exceed that volume of timber in a year. The Forest Service cannot reach its allowable sale quantity on any of its national forests in Oregon due to a combination of budget constraints, personnel limitations, Endangered Species Act consultations, restrictions in the Northwest Forest Plan (which governs all the national forests in western Oregon) and citizen appeals and litigation of planned timber sales. There is no reasonable possibility the Forest Service can increase its annual timber sales beyond the level it currently sells.

35. The State of Oregon only owns a small amount of commercial forest lands, and offers a very small annual sale program each year. The Oregon state sale trend is down due to new management constraints and litigation, and Oregon is trying to sell some of its state-owned timberlands to private interests. There is no plausible chance Oregon state lands will increase their annual timber sales beyond the current level.

Page 16 - Complaint

36.  Swanson currently purchases over 130 million board feet per year of private timber. Swanson is one of the largest purchasers of private timber in the state of Oregon.  Virtually all of the companies it buys timber from manage their lands on a long-term sustained-yield basis, which means these companies do not have the capacity to increase their annual sales above current levels.  These timber sellers are free to sell timber to whomever they choose, including foreign buyers such as China, or not to sell timber in times of unfavorable market conditions.  Most of Swanson's private timber purchases are on the "spot" market, based on currently available logs. Swanson cannot rely on unpredictable future private timber sale levels to expand its operations.

37.  The BLM's western Oregon O&C districts are the only timber sellers that have the capacity to increase timber sales that Swanson might be able to purchase at competitive auction.  Those districts can sell more timber if ordered to do so because that is what has happened in the Medford and Roseburg Districts when the court in *Swanson Group v. Salazar*, No. 10-1843 (D.D.C.) ordered the BLM in 2013 to sell or offer for sale the allowable sale quantity (ASQ) declared in its resource management plans (RMPs) for the Medford and Roseburg districts.  In response to the court's order, the BLM significantly increased its timber sale program for Fiscal Years 2014 and 2015 in the Medford and Roseburg districts. Swanson purchased the Rockstar Salvage sale in FY 2014 on the Medford district, containing over 12 million board feet of timber, for $1,180,205.40 (more than $220,000 over the appraised price) and will be injured if it is denied the opportunity to bid on and attempt to purchase additional sales in future auctions.

38.  Not all BLM timber sales are equally reliable as the basis for adding shifts and employees. The O&C Act requires the BLM to sell or offer for sale the allowable sale quantity (ASQ) declared in each of its O&C districts' resource management plans.  These sales, known as ASQ sales, must come from areas of O&C land designated for sustained-yield timber production, must be sold or offered every year, and are therefore reliable as a basis for adding a shift and new employees.  The

Page 17 - Complaint

BLM also offers "non-ASQ" sales involving commercial thinning of reserved areas where no sustained-yield timber production is permitted, but these sales are not reliable as a basis for adding a shift and new employees because there is no statutory requirement for BLM to offer the same amount, or any amount, of these sales each year.

39.  Swanson's inability to secure additional long-term timber supplies necessary to add shifts to its mills is occurring at the present time and currently deprives Swanson of the additional profits that would be generated by adding an additional shift and processing more timber.  For the same reason the reduction in BLM timber sales from the Medford and Roseburg districts under the 2016 RMPs also creates a substantial probability of imminent future injury to Swanson.

40.  Neil Kornze, Director of the BLM, is the official in charge of the BLM and made the decision challenged in this case.  S. M. R. Jewell, the Secretary of the Interior, is the official charged with administering the O&C Act, through the BLM.  Since 1993 several of Secretary Jewell's precedessors, including Bruce Babbitt and Ken Salazar, were personally involved in various decisions concerning the BLM western Oregon O&C lands that are the subject of this case.

## BACKGROUND ALLEGATIONS

### A.  The O&C Act.

41. In 1866 and 1870 Congress passed legislation that led to grants of large amounts of federally-owned land in western Oregon to the Oregon and California Railroad Company in exchange for construction of a north-south rail line from the Columbia River to California.  The grant was conditioned on requirements that the land be resold by the railroad to "actual settlers" in parcels not to exceed 160 acres and for no more than $2.50 per acre.  Once acquired by the railroad, these lands became subject to county property taxes and were an important source of tax revenues for the counties in which the lands are located (the "O&C Counties").  The railroad completed construction of the rail line and initially complied with the terms of the grant, but eventually ceased

Page 18 - Complaint

reselling lands to actual settlers.  Controversy followed, during which the railroad stopped paying property taxes to the O&C Counties on the grant lands.  Following a lengthy court battle, Congress passed the Chamberlain-Ferris Revestment Act in 1916, revesting the grant lands ("O&C lands") to federal ownership, but requiring the government to pay the railroad company the amount it would have received had it sold the lands as the grant legislation originally required.  A smaller amount of land associated with the Coos Bay Wagon Road was also reconveyed to the United States in 1919 in a similar manner, and is also included herein in the reference to "O&C lands."

42. The 1916 Chamberlain-Ferris Act required that the O&C lands be classified as timberlands, agriculture lands or power-site lands, that the timber on these lands be sold as rapidly as reasonably possible, and that the cutover lands classified as timber or agricultural lands be returned to private ownership and county tax rolls by selling them for $2.50 per acre.  An amount was appropriated from the Treasury to pay counties the back taxes owed by the railroad at the time of revestment in 1916, and to pay the railroad what it would have earned from selling the lands as was originally required.  Future sums from expected land and timber sales were earmarked for sharing with the O&C Counties to offset the loss of property taxes after 1916 until the lands were finally once again all in private ownership.  Those payments to counties, however, would be delayed until the federal government had first recovered from land and timber sales all amounts appropriated in 1916 in connection with the terms of the Revestment Act. For the next 10 years the land and timber sales were insufficient to repay the amount appropriated in 1916, and the O&C Counties therefore received nothing from 1916 until 1926.  In order to relieve the financial plight of the counties, Congress passed additional legislation in 1926 that appropriated monies to pay the equivalent of county taxes on the O&C lands still in federal ownership from 1916 through 1926. The policy of selling timber and then selling the cutover lands continued.

Page 19 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

43. The 1926 law did not take into account that most of the remaining lands were unsuitable for agriculture, and did not consider the adverse impact that liquidating the timber with no provision for reforestation would have on local timber-dependent communities.  Controversy regarding the lands continued.   In 1937 Congress enacted the O&C Act, abandoning the cut-and-dispose philosophy of the 1916 and 1926 laws and replacing it with a new policy calling for permanent timber production from the O&C lands based on the scientific forestry principle of "sustained yield" to produce a permanent timber supply and to provide revenues to the O&C Counties that had been promised but not delivered by prior legislation.  Determination of a sustained yield timber harvest level for a forested area requires two facts:  the volume of standing timber and the "rotation period" (the time for a tree to grow from a seedling to optimum harvest size).  The volume of standing timber is divided by the years in the rotation period to calculate the allowable annual sustained yield timber harvest, which can then continue in perpetuity.  At the time of enactment of the O&C Act, Congress' best available estimate of the standing timber on the O&C lands was approximately 50 billion board feet.  To set an interim timber sale level pending completion of more accurate volume and rotation determinations, Congress used an approximate 100 year rotation period, and thus established 500 million board feet per year as the minimum required sale level until the larger sustained yield amount could be accurately determined (*i.e.*, annually harvesting 500 million board feet of timber for 100 years would remove 50 billion board feet of timber, while regeneration and regrowth of new trees would produce 50 billion board feet of new timber in 100 years, leaving at least as much timber standing at the end of the 100 years as at the beginning).  To implement the new policy the O&C Act provided:

> [O & C lands] classified as timberlands . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [*sic*] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities.

Page 20 - Complaint

The annual productive capacity for such lands shall be determined and declared . . . Provided, that timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market.

43 U.S.C. §1181a.  Thus, the O&C Act imposes four mandatory duties on the BLM:

1. All of the O & C lands classified as timberlands "shall be managed . . . for permanent forest production."

2. The timber on those lands "shall be sold, cut, and removed in conformity with the princip[le] of sustained yield ...."

3. "The annual productive capacity for such lands shall be determined and declared."

4. Timber from the O&C timberlands "in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market."

44. Following passage of the O&C Act, the Interior Department immediately began to determine the inventory of standing timber and the proper classification of O&C lands as timberlands.  By 1942 the Department determined that 2,446,000 acres of O&C lands were properly classified as timberlands (referred to as "O&C timberlands").  U.S. Department of Interior General Land Office, *Forever Timber: Perpetual Sustained Yield Forestry on the Revested Oregon and California Railroad Grant Lands and the Reconveyed Coos Bay Wagon Road Grant Lands in Western Oregon* (1945) at 17.  The Department also immediately began marketing timber from the O&C lands, selling 593 million board feet of timber sales from the O&C lands in fiscal year 1940. W. Horning, *The O&C Lands and their Management, an Important Advance in Forest Conservation* (U.S. Department of Interior General Land Office) (December 1940) at 7.

45. The O&C Act authorizes the Secretary to subdivide the revested lands "into sustained-yield forest units, the boundary lines of which shall be so established that a forest unit will

Page 21 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

provide, insofar as practicable, a permanent source of raw materials for the support of dependent communities and local industries of the region ....” 43 U.S.C. §1181a.  Under this authority the BLM has subdivided the O&C lands into five “districts” based in the western Oregon cities of Coos Bay, Eugene, Medford, Roseburg and Salem, and a subdivision of a sixth district (the Lakeview district) based in Klamath Falls.

46. After the BLM determined the annual productive capacity of the six units, the agency steadily increased the allowable sale quantities until starting in 1959 the BLM began selling an average of more than 1.1 billion board feet (bbf) of timber from the O&C lands every year for the next 32 years, with the peak sale level of 1.662 bbf occurring in 1960.  *See* FEIS 602; Final Environmental Impact Statement for the Revision of the Resource Management Plans of the Western Oregon Bureau of Land Management (October 2008) at 3-239-40.  This level of annual timber sales proved to be sustainable in perpetuity:  the standing timber on the O&C lands in 1990 was greater than in 1960.  FEIS 333.

47. To provide a reliable stream of income to the O&C Counties, the O&C Act mandated that 50 percent of the gross revenues from timber sales on the O & C lands be paid to the counties, 43 U.S.C. §1181f (a), and that an additional 25 percent of the gross revenues from timber sales on the O & C lands also be paid to the counties under certain conditions.  43 U.S.C. §1181f (b).  The remaining 25 percent of gross revenues would go to the government to cover the administrative cost of running the sale program.

48. The BLM currently manages approximately 2,151,200 acres of O&C lands.  FEIS 118. In 2008 the Director of the BLM recognized that “[b]ased on the O&C Act, management of timber is the dominant use of the O&C lands in western Oregon” and affirmed that “[t]he O&C Act requires O&C lands classified as timberlands to be managed for permanent forest production following the principles of sustained yield, which include determining and declaring the annual productive capacity

Page 22 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

of such lands with the timber from those lands (not less than the annual sustained yield capacity) being sold annually."  In 2016 Defendant Kornze again confirmed that "The O&C Act established sustained-yield timber production as the primary or dominant use of O&C lands in western Oregon."  Director's Protest Resolution Report (August 5, 2016) 188.

**B.      Resource Management Plan Development and Revision under FLPMA.**

49. FLPMA, adopted in 1976, requires the BLM to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. §1712(a).  FLPMA also requires the BLM to provide the public adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.  43 U.S.C. §1712(f).  FLPMA's procedural measures apply to the O&C lands, but in the event FLPMA conflicts with the substantive measures of the O&C Act "insofar as they relate to the management of timber resources," the O&C Act prevails.  43 U.S.C.A. § 1701 Savings Provision Note (West 2010).

**C.       BLM Management of O& C lands since 1994.**

50. In 1994 the Secretaries of Interior and Agriculture adopted a land management plan known as the Northwest Forest Plan (NWFP) for the administration of the O&C lands as well as all or parts of 19 national forests in Washington, Oregon and California that lie within the range of the northern spotted owl, a bird that was listed throughout its range as a threatened species under the Endangered Species Act in 1990.  55 Fed. Reg. 26114 (June 26, 1990).

51. The BLM adopted RMPs in 1995 to implement the NWFP.  The 1995 RMPs reduced the annual sustained yield timber level on the O&C lands to 211 mmbf, an 82% reduction from the previous allowable level.  FEIS 341.  The annual harvest level was later further reduced to 203 million board feet, *id*, but in 2016 BLM recalculated that ASQ and raised it to 277 million board feet based on new data and analysis.  *Id*.  The 1995 plans permitted sustained yield timber management

Page 23 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

on only 27 percent of the O&C timberlands. As a result of these decisions, the revenues from O&C timber sales dropped sharply, severely reducing payments to the 18 O&C Counties in western Oregon.  To replace the lost revenues to the O&C counties, starting in the mid-1990's the federal government appropriated and paid several billion dollars of direct federal payments to the counties, with the funding levels steadily dropping as time passed, and ending in 2016.  As a result of the absence of O&C timber revenues and the diminishing federal grant program, exacerbated in recent years by poor economic conditions, rural western Oregon counties have faced, and continue to face, a grave financial crisis, with counties publically discussing bankruptcy filings and wholesale layoffs of law enforcement personnel.

52. Plaintiffs AFRC, CIC, C & D, Swanson and other citizens filed a legal challenge in this Court against the Secretary of Interior's adoption of the 1994 NWFP in *American Forest Resource Council et al. v. Dombeck*, No. C94-1031 (D.D.C.).  On October 17, 2003 the parties in that case (then captioned *AFRC v. Caswell*) entered into a Settlement Agreement to resolve the case, which included an agreement for the BLM to "revise its resource management plans for its Coos Bay, Eugene, Lakeview, Medford, Roseburg and Salem Districts by December 31, 2008."  Settlement Agreement, paragraph 3.5.

53. In 2005 the BLM began the plan revision process required by the 2003 Settlement Agreement, which BLM called the Western Oregon Plan Revision (WOPR).  Each of the six WOPR plans was prepared and adopted in accordance with the BLM's FLPMA land use planning regulations.  The BLM undertook extensive public involvement during the plan revision process, beginning in August 2005 and extending through December 2008.

54. On December 30, 2008 the Secretary of Interior approved the WOPR RODs for the six BLM districts consistent with the schedule in the Settlement Agreement in *AFRC v. Caswell*.  *See* 74 Fed. Reg. 829 (January 8, 2009).  The six WOPR RODs went into effect immediately.  *Id*.  The

Page 24 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

six WOPR RODs collectively directed the BLM to offer 502 million board feet of timber per year.

55. On July 16, 2009, the Department of Interior's Acting Assistant Secretary of Interior for Land and Minerals Management purported to withdraw the WOPR RODs through a two-page internal memorandum to the Acting Director of the BLM.  The decision included direction for the BLM to return to management of the O&C lands under its 1995 RMPs, *id.*, and the BLM did so.

56. Plaintiffs DTO, CIC, Seneca Jones and Swanson Group filed a lawsuit in this court challenging the withdrawal of the WOPR RODs.  On March 31, 2011 the court found that the withdrawal was procedurally unlawful under FLPMA, and vacated and remanded the unlawful withdrawal decision, which had the effect of reinstating the WOPR. *Douglas Timber Operators v. Salazar*, 774 F.Supp.2d 245, 261-62 (D.D.C. 2011).

57. Environmental groups then filed an action in Oregon challenging the BLM's failure to engage in consultation on the WOPR RODs under the ESA, 16 U.S.C. §1536(a)-(b), with the U.S. Fish and Wildlife Service and the Commerce Department's NOAA Fisheries. *Pacific Rivers Council v. Shepard*, Civ. No. 11-442-HU (D. Or. filed April 8, 2011).  The Oregon district court entered an order on May 16,2012 vacating the WOPR RODs and reinstating the 1995 RMPs.

58. On March 12, 2012 the Interior Department announced that BLM would commence a new process for revising the 1995 RMPs.  That process culminated in the decision by defendant Kornze on August 5, 2016 adopting the 2016 RMPs for the six BLM districts in Western Oregon.

59. The BLM has determined that at the present time the annual productive capacity of the O&C timberlands, based on the entire land base of O&C timberlands, is approximately 1.2 billion board feet of timber per year.  FEIS 340, 1853.  The current standing volume of timber on the O&C timberlands is 72-73.3 billion board feet.  FEIS 334, 335 (two differing estimates).

60. The 2016 RMPs together designate 957,872 acres (38 percent of the total area) of O&C timberlands as late-successional reserves where the sale, cutting and removal of timber in conformity

Page 25 - Complaint

with the principles of sustained yield timber management is prohibited.  The 2016 RMPs designate another 520,092 acres (21 percent of the total area) as "Riparian Reserves" where the sale, cutting and removal of timber in conformity with the principles of sustained yield timber management is prohibited.  Finally, the 2016 RMPs designate another 362,894  acres (15 percent of the total area) as "Other Reserves," including Special Recreation Management Areas, where the sale, cutting and removal of timber in conformity with the principles of sustained yield timber management is prohibited. The 2016 RMPs designate only 498,597 acres (20 percent of the lands suitable for timber production) as the "Harvest Land Base" available for sustained-yield timber management, and even that small area is subject to harvest constraints inconsistent with sustained-yield management under the O&C Act.  The level of permitted annual sustained-yield timber harvest dropped from 277 million board feet under the Northwest Forest Plan (as recalculated by BLM in 2016) to 205 million board feet, a 26 percent reduction.  FEIS 341.  In southwestern Oregon, the reductions are even greater on a percentage basis: the Coos Bay ASQ falls from 46 million board feet to 12 million board feet, a 74 percent drop; the Medford ASQ declines from 73 million board feet to 37 million board feet, a 49 percent drop; and the Roseburg ASQ goes down from 55 million board feet to 32 million board feet, a 42 percent drop.

61. The legal violations described below are causing current and threatened injury to plaintiffs, who have no remedy at law for these injuries.

## CLAIM FOR RELIEF

**(Violation of O&C Act, 43 U.S.C. §1181a; arbitrary and capricious agency action under 5 U.S.C. §706(2); approval of 2016 RMPs that fail to require management of O&C timberlands for permanent sustained yield timber production, fail to sell timber from O&C timberlands in conformity with the principle of sustained yield, unlawfully determine and declare the annual productive capacity of O&C timberlands, and fail to require annual offering of timber sales equal to the annual productive capacity of O&C timberlands)**

62.  Plaintiffs repeat and reallege the allegations in paragraphs 1-61 as if fully set forth herein.

Page 26 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

63. The 2016 RMPs violate the O&C Act, 43 U.S.C. § 1181a.  The RMPs do not allow the timber on 74 percent of the O&C timberlands to be sold, cut, and removed in conformity with the principle of sustained yield by assigning those lands to land use allocations that do not permit sustained yield timber production, and place unlawful constraints on management of the 20 percent of O&C timberlands in the "Harvest Land Base" that prevent full sustained yield timber production of those lands.  Although the actual productive capacity of the O&C timberlands is approximately 1.2 billion board feet per year, the 2016 RMPs set the annual sustained yield harvest level at 205 million board feet, just 17 percent of the required total. The BLM is not selling, and has no intention of selling, the actual annual productive capacity of the O&C timberlands of approximately 1.2 billion board feet.

64. The non-discretionary duties imposed on the BLM by the O&C Act to manage all O&C timberlands for sustained yield timber production are the exclusive criteria for management of the O&C timberlands.  The O&C Act does not identify wildlife conservation or the protection of threatened or endangered species as a factor for management of the O&C timberlands.  When adopting a resource management plan for the O&C lands as required by FLPMA, the O&C Act prohibits the BLM from considering any factors outside the O&C Act.  The BLM does not have authority under the O&C Act to manage any of the O&C timberlands for wildlife conservation or protection of endangered or threatened species in a manner that does not constitute sustained yield timber production required by the O&C Act.  Nonetheless, the 2016 RMPs unlawfully assert that "[t]he purpose of the action includes contributing to the conservation and recovery of threatened and endangered species within the planning area, including the northern spotted owl, marbled murrelet, and threatened and endangered anadromous fish" and that this purpose "necessarily includes maintaining a network of large blocks of forest to be managed for late-successional forests and maintaining older and more structurally-complex multi-layered conifer forests." FEIS 7. Defendant

Page 27 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347   ●   E-mail:  markrutzick@rutzick.com

Kornze expressly asserted on August 5, 2016 that "[t]he BLM must comply with the O&C Act as well as other environmental statutes, including ... the ESA."

65. The BLM's approval of the 2016 RMPs that fail to require management of O&C timberlands for sustained yield timber production, fail to sell timber from O&C timberlands in conformity with the principle of sustained yield, fail to determine and declare the annual productive capacity of O&C timberlands, and fail to require annual offering of timber sales equal to the annual productive capacity of O&C timberlands in accordance with the O&C Act is arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.     A declaration that defendant Kornze's decision to approve the 2016 RMPs that fail to require management of O&C timberlands for permanent sustained yield timber production, fail to sell timber from O&C timberlands in conformity with the principle of sustained yield, fail to determine and declare the annual productive capacity of the O&C timberlands, and fail to require annual offering of timber sales equal to the annual productive capacity of O&C timberlands in accordance with the O&C Act violates the O&C Act, 43 U.S.C. § 1181a, and that these violations are arbitrary and capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, in excess of statutory authority and short of statutory right under 5 U.S.C. § 706(2).

2.     A declaration that the non-discretionary duties imposed on the BLM by the O&C Act are the exclusive criteria for management of the O&C timberlands, that when the BLM adopts a resource management plan for the O&C lands as required by FLPMA, the O&C Act prohibits the BLM from considering any factors outside the O&C Act, and that the BLM does not have authority under the

Page 28 - Complaint

Mark C. Rutzick, Inc.
12402 Myra Virginia Ct
Oak Hill, Virginia 20171
Phone/Fax:  703-870-7347  ●  E-mail:  markrutzick@rutzick.com

O&C Act to manage any of the O&C timberlands for wildlife conservation or protection of endangered or threatened species in a manner that does not constitute sustained-yield timber production required by the O&C Act.

3.　　An order vacating and remanding the 2016 RMPs to the Secretary of Interior.

4.　　An injunction requiring the BLM to offer at least 500 million board feet of timber sales from O&C timberlands annually at reasonable prices on a normal market until the BLM adopts new RMPs that comply with the O&C Act.

5.　　An order awarding plaintiff AFRC its attorneys fees under the Equal Access to Justice Act, 28 U.S.C. §2412.

6.　　Granting plaintiffs such further relief as may be just, proper and equitable.

Dated this 5th day of August, 2016.

By:＿＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿＿

Mark C. Rutzick, D.C. Bar No. 979547
markrutzick@rutzick.com
Mark C. Rutzick, Inc.
12402 Myra Virginia Ct., Oak Hill, VA 20171
Telephone/Facsimile: (703) 870-7347
Attorney for Plaintiffs

Page 29 - Complaint