## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>TRACY STONE-MANNING, Director of the Bureau of Land Management, and DEBRA A. HAALAND, Secretary of the Interior,<br><br>  Defendants. | ) Case No.: 1:16-cv-01599-RJL<br>)<br>)<br>)<br>)<br>)<br>) DEFENDANTS' RESPONSE TO<br>) PLAINTIFFS' OBJECTIONS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

On November 19, 2021, the Court issued a single remedy order (Remedy Order) in three non-consolidated cases requiring, among other things, that the U.S. Bureau of Land Management (BLM) submit a status report no later than 120 days from the date of the Remedy Order "detailing what, if any, aspects of the Wildlife Provisions remain permissible in light of the O&C Act and this Court's Memorandum Opinions." Remedy Order 13-14, ECF No. 72; *Ass'n of O&C Cntys. v. Nedd*, No. 1:16-cv-1602, ECF No. 58; *Swanson Grp. Mfg. LLC v. Haaland*, No. 1:15-cv-1419, ECF No. 87. The referenced Wildlife Provisions are the portions of the two 2016 Resource Management Plans (RMPs) for BLM lands in western Oregon "found at pages 95-102 of the Northwestern and Coastal Oregon Record of Decision/RMP and pages 115-121 of the Southwestern Oregon Record of Decision/RMP." Remedy Order 8 (citing JA-1_IND_0512797-804 and JA-2_IND_0513137-43). And the referenced Memorandum Opinions are *American Forest Resources Council v. Hammond (AFRC)*, 422 F. Supp. 3d 184 (D.D.C. 2019) and

1

*Swanson Group, Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22 (D.D.C. 2019).

On March 21, 2022, Defendants submitted a status report explaining that

two of the Wildlife Provisions, depending on future conditions, are potentially inconsistent with this Court's decision in *AFRC* because if surveys detect occupied red tree vole habitat or marbled murrelet occupied stands in lands allocated to the Harvest Land Base, the land use allocation of the area would change to the Late-Successional Reserve and have management objectives and direction consistent with that allocation.

Status Report 2, ECF No. 76.  Defendants further explained that "[n]one of the other Wildlife

Provisions result in a similar re-allocation of lands to the Late-Successional Reserve."  *Id.*

Plaintiffs objected to Defendants' status report, claiming that it "misread[] the Court's

merits holding," identifying what they considered to be "problematic wildlife provisions about

which BLM said nothing," and asking the Court to order BLM to specifically identify the

Wildlife Provisions that "remain permissible."  Pls.' Resp. to Defs.' Status Report 4, 6-7, ECF

No. 77 (Pls.' Obj.) (quotations omitted).  In a Minute Order dated May 10, 2022, the Court

ordered Defendants to respond within forty-five days "to plaintiffs' objection to the adequacy of

defendants' response to this Court's Remedy Order requiring defendants to 'detail[] what, if any,

aspects of the Wildlife Provisions remain permissible in light of the O&C Act and this Court's

Memorandum Opinions.'"  The Court further ordered Defendants to specifically address "each

Wildlife Provision raised by plaintiffs in their objection and explain why (or why not), in

defendants' view, those provisions remain permissible."

As explained in section I, *AFRC* held that BLM's allocation of O&C timberlands to

reserves violated the O&C Act "by excluding portions of O&C timberland from sustained yield

timber harvest."  422 F. Supp. 3d at 190.  Unlike the reserves, however, land allocated to the

Harvest Land Base is managed for timber production under sustained yield principles to achieve

the declared allowable sale quantity (ASQ).  The Wildlife Provisions identified in Plaintiffs'

response do not result in reallocating lands to reserves that prohibit sustained yield timber production.  Instead, depending on site-specific conditions at the time of a particular timber sale, the selling, cutting, and removal of timber in certain stands may be temporarily deferred.  But these stands remain in the Harvest Land Base and subject to management for sustained yield timber production in the future.  As a result, these provisions are not impermissible in light of the O&C Act and the Court's Memorandum Opinions.  Moreover, as acknowledged in the Remedy Order, the Endangered Species Act (ESA) and other environmental statutes apply to BLM's discretionary decisions involved in preparing and offering timber sales on O&C timberlands, including selecting the timberlands to include in the sales.

Section II details BLM's review of each of the provisions identified by Plaintiffs' objections in all three cases as impermissible in light of the O&C Act and the Memorandum Opinions, explaining that rather than re-allocating lands to reserves that prohibit sustained yield timber harvest, at most those provisions have the potential of temporarily deferring particular stands or trees from harvest depending on currently unknown conditions at the time and in the location of a particular timber sale.  But this temporary deferral of harvest does not remove these stands from the Harvest Land Base and they will eventually be harvested consistent with BLM's sustained-yield calculations for its western Oregon lands that are based on the presumption in the final environmental impact statement (FEIS) vegetation modeling that sometime within the next 200 years every stand in the Harvest Land Base will be harvested at least once.

Section III explains that immediate vacatur of the Wildlife Provisions would have highly disruptive consequences by potentially prohibiting BLM from relying on programmatic consultations under the ESA and a programmatic FEIS under the National Environmental Policy Act (NEPA).  This would disrupt BLM's ability to offer timber sales and jeopardize its ability to

continue meeting the declared ASQ in the 2016 RMPs, which it has met each year that those RMPs have been implemented.  As a result, the stay of vacatur of the Wildlife Provisions should not be lifted.

**I.        Response to Plaintiffs' Objections**

The 2016 RMPs categorically prohibit sustained-yield timber production on timberlands BLM allocated to reserves.  *See AFRC*, 422 F. Supp. 3d at 188.  *AFRC* held that this violated the O&C Act.  *Id.* at 188-89.  Unlike the management direction for reserves, however, the Wildlife Provisions, other than the two identified in Defendants' status report, do not categorically "prohibit the selling, cutting, and removing of timber in conformity with the principle of sustained yield on portions of O&C timberland" within the Harvest Land Base or re-allocate lands to reserves.  *Id.* at 189; *see also id.* at 190 (BLM cannot "exclud[e] portions of O&C timberland from sustained yield timber harvest.").  To the contrary, the Harvest Land Base's objectives are, among others, "to achieve continual timber production that can be sustained through a balance of growth and harvest," and to "[o]ffer for sale the declared Allowable Sale Quantity of timber."  JA-1_IND_0512761; JA-2_IND_0513084.  The 2016 RMPs further prescribe the specific silvicultural treatments to be employed to meet the declared ASQ.  JA-1_IND_0512761-65; JA-2_IND_0513084-92.

In managing the Harvest Land Base under principles of sustained yield, application of the Wildlife Provisions to specific stands may, depending on the timberlands selected for a particular timber sale, result in some trees not being harvested as part of that particular sale.  This, however, does not mean that those trees are categorically prohibited from sustained yield timber harvest, as with reserves, or would not be included in a later timber sale as part of BLM's sustained-yield management of the Harvest Land Base.

4

To the contrary, BLM's sustained-yield calculations for its western Oregon lands are based on the presumption in the FEIS vegetation modeling that sometime within the next 200 years every stand in the Harvest Land Base will be harvested at least once.  Second Decl. of Barry R. Bushue (Second Bushue Decl.) ¶ 8.  In preparing timber sales to meet the ASQ, BLM exercises discretion to choose when a stand will be harvested, which parts of a stand will be harvested, and the overall intensity of harvest.  *Id.*  Stands or portions of Harvest Land Base stands deferred from harvest will be harvested at some time in the future.  *Id.*  In other words, they are still subject to sustained-yield timber harvest even if they are excluded from a particular timber sale at a particular time.

As a result, unless management direction re-allocates lands from the Harvest Land Base to reserves that categorically prohibit sustained-yield timber harvest, that direction would not be inconsistent with the Court's Memorandum Opinions.  Nothing in the Court's Memorandum Opinions dictates that timber harvest must occur in a certain place and at a certain time on O&C timberlands.  Rather, the Memorandum Opinions held that BLM cannot allocate O&C timberlands to reserves in which sustained yield timber production is prohibited.  Plaintiffs' reading of the Memorandum Opinions to prohibit any management direction that may temporarily defer sustained-yield timber harvest of even a single tree on O&C timberlands misunderstands the import of that management direction as well as the holding of the Memorandum Opinions.

Moreover, plaintiffs are wrong to contend that the ESA or other environmental statutes do not apply to BLM's implementation of timber sales on the Harvest Land Base.  Pls.' Obj. 3-4.  According to the Memorandum Opinions, "BLM has discretion as to establishing the ASQ, selecting the timberlands, pricing the sale (at 'reasonable prices on a normal market'),

scheduling the sale, and even rejecting bids." *AFRC*, 422 F. Supp. 3d at 190 (citation and

quotation omitted).  In other words, BLM has discretion to identify the timberlands that will be

included in a particular timber sale and in the actions necessary to offer timber from those

timberlands for sale.  As the Remedy Order explained, "plaintiffs also read too much into the

Memorandum Opinions" because BLM, in performing these discretionary functions, may need

"to consult under Section 7(a)(2) of the ESA."  Remedy Order 10-11.  As such, under the O&C

Act, as interpreted in the Memorandum Opinions, BLM cannot place O&C timberlands in

reserves where sustained yield timber production is categorically prohibited.  But in exercising

its discretion to identify timberlands from the Harvest Land Base to sell, cut, and remove under

the principle of sustained yield for a particular timber sale, BLM must continue to comply with

the ESA and other environmental statutes.  As noted above, although that may result in certain

trees or stands being omitted from a particular timber sale, it does not foreclose harvest at a later

date.

In short, as noted in Defendants' status report dated March 21, 2022, "two of the Wildlife

Provisions, depending on future conditions, are potentially inconsistent with the Court's decision

in *AFRC* because" they may result in re-allocation of lands from the Harvest Land Base to the

Late-Successional Reserve where they would be categorically prohibited from sustained yield

timber harvest.  Status Report 2.  But because none of the other Wildlife Provisions would result

in a similar re-allocation that would categorically prohibit O&C timberlands from sustained yield

timber harvest, they are not impermissible "in light of the O&C Act and this Court's

Memorandum Opinions."  Minute Order dated May 10, 2022.  Indeed, as Defendants previously

explained, implementation of the Wildlife Provisions to site-specific timber sales in the Harvest

Land Base has not prevented BLM from continuing to achieve the declared ASQ for the Harvest Land Base under the 2016 RMPs.  Status Report 2-3; Second Bushue Decl. ¶ 28.

**II.     Assessment of Wildlife Provisions Raised by Plaintiffs' Objections**

For the reasons noted above and in Defendants' status report, only "two of the Wildlife Provisions, depending on future site-specific conditions, are potentially inconsistent" with the Court's decision and the rest of the Wildlife Provisions remain permissible in light of the O&C Act and the Memorandum Opinions.  Status Report 2.  As required by the May 10, 2022, Minute Order, the following section explains that the Wildlife Provisions identified by Plaintiffs in all three cases are consistent with the O&C Act and Memorandum Opinions because they, at most, have the potential of deferring particular stands from harvest depending on conditions at the time and location of a particular timber sale.  As discussed above, this does not mean that those stands are categorically precluded from being managed for sustained yield timber production under the 2016 RMPs.  To the contrary, BLM's sustained-yield calculations for its western Oregon lands are based on the presumption in the FEIS vegetation modeling that sometime within the next 200 years every stand in the Harvest Land Base will be harvested at least once.  Second Bushue Decl. ¶ 8.  Conditions at the time a timber sale is being prepared may result in deferral of that harvest as to certain stands to a later date, but that does not mean that they are not subject to sustained yield harvest.

The Second Declaration of Barry R. Bushue, BLM's State Director for Oregon and Washington, explains that the Wildlife Provisions identified by Plaintiffs have the potential to, at most, defer timber harvest as to certain stands or trees at a particular time and place but do not preclude sustained yield timber harvest:

Wildlife – Northern Spotted Owl:  The 2016 RMPs provide that timber sales will not be authorized "that would cause the incidental take of northern spotted owl territorial pairs or

resident singles from timber harvest until implementation of a barred owl management program consistent with the assumptions in the Biological Opinion on the RMP has begun."  JA-1_IND_0512802; JA-2_IND_0513143.  Depending on project- and site-specific conditions, this management direction has the potential of deferring timber harvest if that harvest would result in the incidental take of northern spotted owl territorial pairs or resident singles.  Second Bushue Decl. ¶ 9.  But this deferral occurs only while the area is occupied by a northern spotted owl.  JA-1_IND_0512807 ("As part of the process to determine whether a planned timber harvest would result in take of northern spotted owls, the BLM will establish whether the northern spotted owl is actually present in the area that will be affected by the timber harvest . . . ."); JA-2_IND_0513149 (same).  Northern spotted owls regularly abandon nests and territories, at which time the area would be available for sustained yield timber harvest.  Second Bushue Decl. ¶ 9.  This means that even if timber harvest of some trees or stands is deferred for a particular timber sale, those trees and stands are still being managed for sustained yield as part of the Harvest Land Base.  *Id.*

Moreover, this management direction applies only until implementation of a barred owl management program.  *Id.* ¶ 10.  As a result, although some timber harvest may be temporarily deferred if it would cause the incidental take of northern spotted owl territorial pairs or resident singles, that deferral does not remove any stands from sustained yield timber harvest.  *Id.* Timber harvest that causes incidental take is permissible once a barred owl management program is in place.  *Id.*

The Second Geissler Declaration also claims that the 2016 RMPs incorporate Recovery Action 32 of the Revised Recovery Plan for the northern spotted owl and identifies a project that he claims implemented the 2016 RMPs to defer timber harvest on some stands to comply with

Recovery Action 32.  Second Decl. of Andy Geissler (Second Geisler Decl.) ¶¶ 8-9, ECF No. 78.[1]  Mr. Geissler is mistaken on both accounts.  First, the 2016 RMPs explain that "the land use allocations constitute BLM's contribution to Recovery Action 32," and that "BLM will not defer or forego timber harvest of stands in the Harvest Land Base to contribute to Recovery Action 32."  JA-1_IND_0512807; JA-2_IND_0513149.  Second, the project identified in the Geissler Declaration is from 2015, before approval of the 2016 RMPs.  *See* Second Bushue Decl. ¶ 12.  As such, that project did not, and could not, apply the management direction in the 2016 RMPs.

Wildlife – Fisher: The 2016 RMPs prohibit "actions that would disrupt normal fisher behaviors (e.g., foraging, resting, or denning) associated with known natal or maternal denning sites . . . ."  JA-1_IND_0512799; JA-2_IND_0513139.  Depending on project- and site-specific conditions, this management direction has the potential of deferring timber harvest until after the natal and maternal denning season when the area is no longer being used for natal or maternal denning.  Second Bushue Decl. ¶ 13.  After the conclusion of that season, sustained yield timber harvest would be permitted.  *Id.*  As such, this provision is consistent with the O&C Act and the Court's Memorandum Opinions.

Wildlife – Marbled Murrelet: Defendants previously noted that the 2016 RMPs' direction that the lands allocated to the Harvest Land Base be re-allocated to the Late-Successional

---

[1] The 2016 RMPs provide for management of "habitat for species that are ESA-listed or are candidates for listing, consistent with recovery plans, conservation agreements, and designated critical habitat."  JA-1_IND_0512797; JA-2_IND_0513137.  Other than Recovery Action 32, however, Plaintiffs identify no other instances in which they claim that this provision is inconsistent with the O&C Act or the Court's Memorandum Opinions.  Lands allocated to the Harvest Land Base to which any such plans, agreements, or critical habitat apply would remain subject to the Harvest Land Base's management direction of sustained yield timber harvest.  Harvest timing restrictions and localized avoidance are applied in the Harvest Land Base but only to the extent they do not preclude sustained yield timber harvest.  Second Bushue Decl. ¶ 11.  Therefore, this provision is consistent with the O&C Act and the Court's Memorandum Opinions.

Reserve if surveys identify marbled murrelet occupied stands would potentially be inconsistent with the Memorandum Opinions.  Status Report 2.  That same management direction notes that BLM will assess the project area for marbled murrelet nesting structure as defined by the 2016 RMPs.  JA-1_IND_0512800; JA-2_IND_0513141.  If BLM finds no nesting structure, "no further consideration of marbled murrelet habitat is required" before timber harvest can occur in the analysis area.  JA-1_IND_0512800; JA-2_IND_0513141.  Where the analysis area contains nesting structure but the survey finds no marbled murrelet occupancy, "no further consideration of marbled murrelet habitat is required" before stands in the analysis area can be harvested.  JA-1_IND_0512800; JA-2_IND_0513141.  If BLM finds nesting structure but does not conduct surveys for occupancy, the 2016 RMPs provide other options from which BLM can choose to manage the stand, including working with the U.S. Fish and Wildlife Service to manage the stands in a way that will not adversely affect nesting marbled murrelets (Option 3).  JA-1_IND_0512800-02; JA-2_IND_0513141-43.  Therefore, other than as noted in Defendants' status report, the management direction for marbled murrelets does not re-allocate lands to reserves and thus it remains permissible in light of the O&C Act and the Court's Memorandum Opinions.  Second Bushue Decl. ¶ 14.

Wildlife – Gray Wolf: This direction provides for the restriction of "activities that create noise or visual disturbance(s) above ambient conditions within one mile of known active gray wolf dens from April 1 to July 15."  JA-1_IND_0512799; JA-2_IND_0513140.  Depending on project- and site-specific conditions, this management direction has the potential of deferring timber harvest in particular stands from April 1 to July 15, but this potential seasonal deferral of timber harvest does not preclude sustained yield timber harvest on any stands.  Second Bushue Decl. ¶ 15.

10

Wildlife – Bald and Golden Eagles: This management direction prohibits the removal of "overstory trees within 330 feet of bald eagle or golden eagle nests," and places seasonal limits on timber harvest operations around nests during the breeding season.  JA-1_IND_0512798; JA-2_IND_0513138.  This management direction is intended to meet BLM's obligation to avoid "take" of these birds as required by the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668c.  Depending on project- and site-specific conditions, this management direction has the potential of deferring timber harvest until outside of the breeding season or until a project area no longer contains a bald eagle or golden eagle nest.  Second Bushue Decl. ¶ 16.  These sites, however, are not permanent and timber harvest would be and is permitted once the area no longer contains a nest.

Wildlife – Surveys: The 2016 RMPs require BLM to conduct various wildlife surveys.  Second Bushue Decl. ¶ 17.  Conducting these surveys does not preclude sustained yield timber production.  *Id.*  The surveys merely gather information for the purpose of informing BLM specialists and decisionmakers and the public about potential effects of proposed timber sales.  *Id.*  As Defendants previously explained in their status report, survey results that require the re-allocation of lands from the Harvest Land Base to the Late-Successional Reserve would potentially be inconsistent with *AFRC*.  Status Report 2.  But any such re-allocation stems from implementation of management direction based on the results of surveys, and is limited to the two species BLM already identified (marbled murrelets and red tree voles).  Second Bushue Decl. ¶ 17.  The gathering of the information itself in no way precludes sustained yield timber harvest.

As the above makes clear, the Wildlife Provisions identified by Plaintiffs in their objections may result in BLM, through the exercise of its discretion to identify timberlands for

sale and to prepare timber sales, deferring the harvest of some trees or stands until on-the-ground conditions change.  But these trees or stands of trees remain part of the Harvest Land Base and subject to sustained yield timber harvest.  Therefore, they are consistent with the O&C Act and the Court's Memorandum Opinions.

### III.      Lifting the Stay of Vacatur of any of the Wildlife Provisions would be Highly Disruptive

Finally, the Court should not lift the stay of vacatur as to any of the Wildlife Provisions because immediate vacatur of those provisions would have highly disruptive consequences.  *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (noting court should consider disruptive consequences of vacatur).  As the Court previously noted when staying vacatur of the 2016 RMPs, "[t]o say the least, revising the 2016 RMPs to comply with the O&C Act will be a complicated endeavor involving many actors and interrelated decision-making processes," and immediately vacating them would inject substantial uncertainty into BLM's management of the O&C lands that "would only further jeopardize statutorily mandated timber sales . . . ."  Remedy Order at 7-8 (citation and quotation marks omitted).  Just as with immediate vacatur of the 2016 RMPs, immediate vacatur of the Wildlife Provisions would significantly disrupt the complicated RMP revision process and further jeopardize BLM's ability to offer timber sales.  Second Bushue Decl. ¶ 19.

BLM approved the 2016 RMPs following consultation with the U.S. Fish and Wildlife Service (FWS) and NOAA Fisheries (collectively, consulting agencies) under section 7(a)(2) of the ESA.  *See* 50 C.F.R. §§ 402.10-.17 (2015) (ESA consultation procedures).  Because the consultation occurred before the 2016 RMPs could be approved, the consultation considered proposed RMPs that included the management direction ultimately adopted by the 2016 RMPs, including the Wildlife Provisions.  Second Bushue Decl. ¶ 20.  This consultation considered the

2016 RMPs as a "framework programmatic action," meaning that the RMPs would "approve[] a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out subject to further section 7 consultation." *Id.* ¶ 21 (citing 50 C.F.R. § 402.02).

BLM and the consulting agencies engaged in a form of programmatic consultation referred to as "tiered consultation," in which the consulting agencies prepared biological opinions addressing whether the proposed RMPs would jeopardize the existence of ESA-listed species or would adversely modify the designated critical habitat of listed species, including the northern spotted owl. *Id.* ¶ 22. These biological opinions included extensive analysis of the anticipated effects of the management direction set forth in the proposed RMPs, including the Wildlife Provisions. *Id.* Site-specific projects, including timber sales, would then be approved after ESA consultation on the effects of those projects. *Id.* ¶ 23. This site-specific ESA consultation is streamlined because it can tier to the analysis contained in the programmatic biological opinions, which provides significant and irreplaceable efficiencies in approving projects, including timber sales, under the 2016 RMPs. *Id.* This programmatic ESA consultation and approval of timber sales through tiering to the programmatic biological opinions has been upheld in the face of challenges by environmental groups. *See Pac. Rivers v. Bureau of Land Mgmt.*, 815 F. Appx. 107, 108-09 (9th Cir. 2020) (upholding biological opinion); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, No. 1:19-cv-1810-CL, 2021 WL 5356969 (D. Or. Aug. 24, 2021) (rejecting NEPA and ESA claims challenging timber sale implementing 2016 RMPs and finding agency properly tiered to programmatic documents), *findings & recommendation adopted by* 2021 WL 5355919 (D. Or. Nov. 16, 2021), *appeal*

13

*docketed* 22-35035 (9th Cir. Jan. 12, 2022); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Fish & Wildlife Serv.*, No. 1:21-cv-58-CL, 2022 WL 856035 (D. Or. March 23, 2022) (denying preliminary injunction motion in case challenging two timber sales implementing the RMP under ESA).

      If the Wildlife Provisions are immediately vacated, BLM would need to coordinate with the consulting agencies on the extent and nature of any ESA requirements, including those under Sections 7 and 9 of the Act.  Second Bushue Decl. ¶ 24.  This would include evaluating whether there is an immediate need to reinitiate the RMPs' existing programmatic Section 7 consultation, which would unnecessarily complicate the consultation process for the RMPs.  *Id.*; 50 C.F.R. § 402.16 (explaining when reinitiation of consultation is required).  If reinitiation of consultation is required, BLM would potentially be reinitiating consultation on the existing 2016 RMPs or conducting site-specific, sale-by-sale consultations without the benefit of the programmatic consultation, while at the same time undertaking the new programmatic consultation the Court has already ordered BLM to undertake on any amended or revised RMPs.  Second Bushue Decl. ¶ 24.

      Moreover, vacatur of the Wildlife Provisions would require BLM to assess whether any previously issued timber sales or any in the planning process risk violation of Section 9 of the ESA.  *Id.* ¶ 25.  Section 9 prohibits any person, which includes government agencies and private companies and individuals, from taking a listed species without a permit.  16 U.S.C. § 1538(a)(1)(B).  Violation of Section 9 can result in civil and criminal penalties.  *Id.* § 1540.  Immediate vacatur of the Wildlife Provisions has the potential to call the incidental take permits issued under the programmatic framework into question.  Second Bushue Decl. ¶ 26.  To avoid this, BLM would need to ensure that all actions implementing the western Oregon timber

program, including each individual timber sale, avoid take of an ESA-listed species completely (reach a "No Effect" determination) or be conducted only after project-specific formal or informal consultation with the consulting agencies under ESA Section 7(a)(2).  *Id.*  This would eliminate the efficiencies gained under the programmatic biological opinions, result in delays in preparing and approving timber sales, and likely prevent BLM from achieving the declared ASQ. *Id.*

Finally, similar to the programmatic ESA consultation, BLM assessed the potential environmental effects of the 2016 RMPs in a programmatic FEIS under NEPA, which was also previously upheld.  *See Pac. Rivers*, 815 F. App'x at 110.  Later NEPA analyses for projects that implement the 2016 RMPs tier to the FEIS, which narrows the scope of the analysis and expedites the review and approval of those projects, including timber sales.  Second Bushue Decl. ¶¶ 27-28.  The efficiencies gained by tiering are a primary reason BLM continues to meet the ASQ declared in the 2016 RMPs.  *Id.* ¶ 28.  If the Wildlife Provisions are vacated, it is unlikely BLM could continue tiering to the FEIS's analysis of potential effects to ESA-listed and other wildlife species in approving projects.  *Id.* ¶ 29.  This would increase the complexity of the NEPA analysis for timber sales, extend the timeline for completing timber sale planning, and jeopardize BLM's ability to continue meeting the declared ASQ in the 2016 RMPs.  *Id.*

For these reasons, immediate vacatur of the Wildlife Provisions would have highly disruptive consequences and would severely hinder BLM's ability to issue timber sales and continue to meet the declared ASQ in the 2016 RMPs.

## CONCLUSION

For the reasons noted above and in Defendants' status report, two of the Wildlife Provisions are potentially inconsistent with the O&C Act and the Court's Memorandum

Opinions because they could result in lands being re-allocated from the Harvest Land Base to the Late-Successional Reserve in which sustained yield timber harvest is prohibited.  At most, the other provisions identified by Plaintiffs could result in a temporary deferral of trees or stands from timber harvest depending on site-specific conditions for individual timber sales.  But those trees or stands of trees remain subject to the Harvest Land Base's management direction for sustained yield timber harvest in the future.  Finally, the stay of vacatur of the Wildlife Provisions should remain in effect because their immediate vacatur would have highly disruptive consequences to BLM's ability to continue issuing timber sales while BLM revises or amends the 2016 RMPs.

Respectfully submitted on this 24th day of June, 2022.

TODD KIM
U.S. Department of Justice
Assistant Attorney General
Environment and Natural Resources Division


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
Phone: (206) 526-6881
shaun.pettigrew@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June, 2022, a copy of this foregoing document was filed electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means as reflected on the Notice of Electronic Filing.

*/s/ Shaun M. Pettigrew*
Shaun M. Pettigrew